STATE OF MAINE                     SUPERIOR COURT
PENOBSCOT, SS.                     CIVIL ACTION
                                   Docket No. CV-05-180
                                   JH-PEN-2/1/06

James N. Riley, D.O., P.A.,
        Plaintiff

                                   FILED & ENTERED
                                   SUPERIOR COURT

    v.                             FEB 01 2006        Order (Motion for Partial
                                                      Judgment on the Pleadings)
                                   PENOBSCOT COUNTY

Michael J. Gilmore, D.O.,
        Defendant



        The defendant has moved for judgment on two of the four counts in the amended
complaint. *See* M.R.Civ.P. 12(c). The court has considered the parties' written
arguments.

        A motion for judgment on the pleadings is analytically identical to a motion to
dismiss for failure to state a claim. *Cunningham v. Haza*, 538 A.2d 265, 267 (Me. 1988).
In both instances, the allegations are taken as true, and the complaint is then examined "in
the light most favorable to the plaintiff to determine whether it sets forth elements of a
cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some
legal theory." *McAfee v. Cole*, 637 A.2d 463, 465 (Me. 1994). A dismissal is proper
"only when it appears beyond doubt that a plaintiff is entitled to no relief under any set of
facts that he might prove in support of his claim." *Hall v. Board of Environmental
Protection*, 498 A.2d 260, 266 (Me. 1985).

        In its essence, the plaintiff ("Riley"), a business entity, alleges that it employed
the defendant and, by agreement of the parties, advanced to the defendant amounts of
money in excess of a formula used to determine his compensation. Riley then alleges
that Gilmore left his employment position and now owes the business the amounts that
had been advanced to him. In addition to claims for breach of contract (count 1) and for
moneys owed (count 4), Riley has asserted claims for unjust enrichment (count 3) and
conversion (count 2). Through the motion at bar, Gilmore seeks judgment on the
pleadings for the latter two claims.

1

First, challenging count 3, Gilmore argues that Riley is precluded from asserting a claim for unjust enrichment because the existence of an employment contract between the parties bars any recovery on a theory of unjust enrichment. *See In re: Wage Payment Litigation*, 2000 ME 162, ¶ 19, 759 A.2d 217, 224. In his responsive pleading, Gilmore has admitted that he entered into an employment contract with Riley. *See* amended complaint and answer at ¶ 2. Although Riley notes the possibility that a contract ultimately might be found unenforceable for some reason, the fact remains that the pleadings establish a contractual relationship between the parties. If the pleadings left open the possibility that the parties did not have a contractual relationship, then, as Riley argues here, the claim for unjust enrichment would be proper as an alternative theory of liability. However, the pleadings in this case would not allow such an outcome. Accordingly, under Maine law, Riley's claim for unjust enrichment is barred by the parties' contractual relationship, which is established in the pleadings.

Next, Gilmore makes the similar argument that he cannot be found liable in tort for converting the money at issue because, among other things, Riley is limited to a claim for breach of contract. As with his position regarding count 3, Riley urges that it is entitled to plead alternative claims for relief. This argument reveals Riley's acknowledgement that the tort claim for conversion could succeed only if its contract claim fails. However, for the reasons noted above, the pleadings establish the existence of a contractual relationship between the parties and allegedly actionable conduct arising from that relationship. As a matter of law, this precludes any opportunity for recovery in tort. *See Innovative Network Solutions, Inc. v. One Star Communications, LLC*, 283 F.Supp.2d 295, 301 (D.Me. 2003).

The entry shall be:

For the foregoing reasons, the defendant's motion is granted. Judgment on the pleadings is entered for the defendant on counts 2 and 3 of the amended complaint.

Dated: February 1, 2006

_____
Justice, Maine Superior Court
Jeffrey L. Hjelm

2

PAUL GAGNON VS ANNE M DODWELL PR EST OF EVERETT GAGNON, ET AL
UTN:AOCSsr  -2004-0127108                    CASE #:BANSC-CV-2004-00245
-----------------------------------------------------------------------

```
SEL VD                               REPRESENTATION TYPE      DATE
03 0000000480 ATTORNEY:TANOUS, WAKINE
ADDR:29 MAIN ST PO BOX 246 EAST MILLINOCKET ME 04430-0246
    F FOR:ANNE MARIE DODWELL PR EST OF EVERETT GAG PR      RTND   12/30/2004
    F FOR:JEANINE J FARRINGTON              DEF            RTND   12/30/2004
    F FOR:RUTH A SHAW                       DEF            RTND   01/05/2005
    F FOR:DANIEL P GAGNON                   DEF            RTND   12/30/2004


04 0000009343 ATTORNEY:BENNETT, JUSTIN M
ADDR:PO BOX 729 ELLSWORTH ME 04605
    F FOR:PAUL GAGNON                       PL             RTND   11/29/2004


SEL VD                               REPRESENTATION TYPE      DATE
01 0000002575 ATTORNEY:BERNIER, DAVID
ADDR:44 ELM STREET PO BOX 708 WATERVILLE ME 04901-0708
    F FOR:NANCY ANN REYNOLDS                DEF            RTND   01/14/2005


02 0000000185 ATTORNEY:BOWIE, JAMES M
ADDR:THREE CANAL PLAZA PO BOX 4630 PORTLAND ME 04112-4630
    F FOR:WAKINE G TANOUS                   DEF            RTND   12/02/2005


03 0000000480 ATTORNEY:TANOUS, WAKINE
ADDR:29 MAIN ST PO BOX 246 EAST MILLINOCKET ME 04430-0246
    F FOR:ANNE MARIE DODWELL                DEF            RTND   12/30/2004
```

JAMES N RILEY, D.O., P.A. VS. MICHAEL J GILMORE, D.O.
UTN:AOCSsr  -2005-0075183                    CASE #:BANSC-CV-2005-00180
--------------------------------------------------------------------------
SEL VD                          REPRESENTATION TYPE      DATE
01 0000003931 ATTORNEY:BUTTERFIELD, LOUIS
ADDR:100 MIDDLE ST PO BOX 9729 PORTLAND ME 04104-5029
     F FOR:MICHAEL J GILMORE DO              DEF         RTND    01/03/2006


02 0000003582 ATTORNEY:DEBEVOISE, KATE
ADDR:100 MIDDLE ST PO BOX 9729 PORTLAND ME 04104-5029
     F FOR:MICHAEL J GILMORE DO              DEF         RTND    11/17/2005


03 0000002247 ATTORNEY:MCGUIRE, FRANK T  + Deborah Reece
ADDR:84 HARLOW ST PO BOX 1401 BANGOR ME 04402-1401
     F FOR:JAMES N RILEY DO PA              PL          RTND    07/29/2005



                      *More Attorneys*
          Enter Option: A=Add, B+Sel=Browse, M=More, R+Sel=RltnEdit:M

Select the EXIT KEY for page selection line.

STATE OF MAINE
PENOBSCOT, SS.

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-05-180
JLH- PEN - 12/27/2007

James N. Riley, D.O., P.A.,
Plaintiff

JAN 2 4 2008

v.

Michael J. Gilmore, D.O.,
Defendant

Decision and Judgment

FILED & ENTERED
SUPERIOR COURT
DEC 27 2007
PENOBSCOT COUNTY

Hearing on the complaint and counterclaim was held on December 20, 21 and 22, 2006. On each hearing date, the parties were present with counsel.

In this action, plaintiff James N. Riley, D.O., P.A. ("Riley PA"), an osteopathic medical practice located in Brewer, claims that defendant Michael J. Gilmore, D.O. is liable for breach of an employment contract between the parties. In his counterclaim, Gilmore contends that Riley PA is liable to him for unpaid wages under both common law and statutory principles. For the reasons set out below, the court enters judgment for Riley PA on both sets of claims.

James N. Riley, D.O. ("Riley") founded Riley PA in 1992. The practice operates under the trade name, East Bank Health Care. Prior to the time when Gilmore became an employee of Riley PA in 2003, Riley was the only full-time physician at the office. Gilmore had practiced osteopathic medicine in Michigan but has ties to the Bangor area. Gilmore was considering relocating to Maine and, because the two share an alma mater, contacted Riley in late 2002 about employment in the area. Riley informed Gilmore that he (Riley) might be in the market to hire "a new associate." *See* plaintiff's exhibit 7. Discussions between Riley and Gilmore progressed toward an employment relationship between Riley PA and Gilmore.

These discussions encompassed a number of issues, including compensation arrangements. Drawing on his experience as an employee at another medical practice, Riley wanted a framework where Riley PA would pay him and Gilmore separate amounts

1

based on the income they generated, less a portion of shared expenses. The proportion of those expenses charged to Riley and Gilmore respectively would be the difference between 50% and the percentage of gross receipts. For example, if one physician's billings created 60% of the total income received by the practice, then that physician's compensation would be calculated by subtracting an amount equivalent to 55% (the mid-point between 50% and 60%) of the shared expenses from the gross income attributable to that physician. During the discussions between Riley and Gilmore, Riley gave Gilmore several spreadsheets that served as examples of how much money Gilmore would be entitled to receive, based on hypothetical receipts and expenses. *See* plaintiff's exhibits 9-12. Riley provided Gilmore with a written description of the compensation formula. *See* plaintiff's exhibit 8. Riley also gave Gilmore financial records and summaries, and offered Gilmore access to any other financial documents relating to Riley PA for Gilmore's inspection.

Riley's proposed arrangement would mean, of course, that neither practitioner would be guaranteed any amount of compensation during a pay period, because the expenses charged to him might exceed the revenues that Riley PA received for his work. This was a particular concern to Gilmore. Gilmore raised the issue of a guaranteed level of compensation and in fact proposed $10,000 per month guaranteed, but Riley refused to agree to such an arrangement, reasoning that the resources of the practice might not support it, particularly in light of a history of collection difficulties.

Ultimately, the parties entered into a written agreement under which Gilmore became an employee of Riley PA for four years. *See* plaintiff's exhibit 1. Riley was the principal drafter of the document, although it reflected the terms to which Gilmore agreed during the parties' negotiations, which were carried out through conversations, emails and exchanges of written drafts. Gilmore also retained independent counsel to review the proposed contract.

The instrument included a description of the formula used to determine the amount of compensation that both Riley and Gilmore would receive from Riley PA. This compensation was described in the agreement as the "Individual Benefit," which would be paid to the respective provider on a monthly basis. The contract further provided:

2

The monthly draw to the Doctor [Gilmore] will be not less than $10,000, even though during an initial period, this will exceed the Individual Benefit according to the Formula; thus, the excess will constitute a draw against future anticipated Individual Benefit amounts, and thus will be treated as an advance from the Corporation [Riley PA] to the Doctor [Gilmore].

*Id.*[1] At trial, Gilmore testified that under this contract, he was entitled to guaranteed monthly compensation payments of $10,000 and, under the contract, would not be liable for the difference between the amount he would be due under the formula and the $10,000 monthly payments. This latter aspect of Gilmore's testimony is undermined by the terms of the written agreement. Although Gilmore correctly stated that Riley PA was obligated to make $10,000 monthly payments to him, Gilmore's agreement with Riley PA obligated him to reimburse Riley PA for any amounts it advanced to him that were in excess of the amount as determined by the compensation formula established in the agreement.

The parties' written agreement encompassed other employment-related issues. It included a non-competition agreement prohibiting Gilmore from practicing medicine within one-half mile of Riley PA's place of business (except as a Riley PA employee), but allowing Gilmore to engage in non-competitive work outside of that radius. If Gilmore received income from the latter-described professional work, that income would be treated as the property of Riley PA.

The remaining term of central relevance to this action recites that Riley PA would obtain a loan to pay for Gilmore's moving expenses and to cover the additional costs created by Gilmore's new employment (including the initial draws that Riley PA would pay to him), because the parties anticipated that Gilmore had only a limited ability to generate revenue at the outset of his employment with Riley PA. Riley PA would obtain the funds through a four-year note. Under the agreement, if Gilmore were to leave the practice during that four-year period, he would be liable to Riley PA for half of the remaining balance due.

---

[1] While Gilmore's contact with Riley PA gave him the right to receive $10,000 monthly, Riley himself took a lesser monthly amount of $8,250 and later $9,000, *see* plaintiff's exhibit 54, even though he had been practicing longer than Gilmore and even though he founded the practice.

Gilmore began working for Riley PA in mid-August 2003, shortly before parties formally executed the contract. Riley PA paid him $5,000 for August (which appears to be a prorated payment for August) and then $10,000 monthly through October 2004. *See* plaintiff's exhibit 54. During that period of time, Gilmore's arrearages to Riley PA steadily increased. As of the end of October 2004, Gilmore had come to owe Riley PA nearly $107,000. *Id.* Riley himself had accumulated a debt to Riley PA of nearly $23,000. *Id.* In significant part, this financial circumstance was due to ongoing problems with the practice's ability to collect accounts receivable. Its collection rate hovered around 50%. This was true prior to the time Gilmore began to practice with Riley PA, and it continued during the time he was affiliated with the business. Riley PA went through several administrative employees who were responsible for billing and collection matters. The firm also received consultations from John Hicks, a CPA who provides accounting services to a number of medical practices, including Riley PA. Although to a lesser degree than Riley, Gilmore was involved in Riley PA's efforts to improve collections and to address the administrative issues accompanying the problem.

Because Gilmore's arrearages had become substantial, Riley approached him about the issue in late 2004 and, as Riley himself put it, tried to "pressure" Gilmore to take steps in response to it. The court finds that either directly or indirectly, Gilmore applied sufficient "pressure" to induce Gilmore to forego the $10,000 payment due in November. The same occurred in December. Although there are differences in the testimonial accounts of this situation as offered by Riley and Gilmore, the court finds that Gilmore did not freely surrender his right to the November and December payments, because the effects of that loss of income were considerable. Gilmore took steps to sell several parcels of property he owned; he curtailed his children's involvement in local recreational programs; and he even was forced to accept financial support from his mother, who held a low-paying job in the area. Gilmore would not have suffered these circumstances voluntarily. The monthly payments to Gilmore resumed in January. Gilmore has never been paid the amounts that were due to him during the last two months of 2004.

As of March 2005, Riley was continuing to address problems with unpaid accounts receivable. As was true earlier in time, Gilmore was also involved in the issue.

4

That month, Riley had contact with an outside consultant and, beginning in April 2005, responsibility for collections was assigned to an outside agency, Laboratory Billing Service, Inc. *See* plaintiff's exhibit 33. Since the time that Laboratory Billing Services has managed Riley PA's accounts receivables, the collection rate has increased modestly, from approximately 50% when Riley PA tried to collect its own amounts due, to 57% under Laboratory Billing Services. *See* defendant's exhibit 26A. Although Gilmore presented expert testimony that higher collection rates should be expected, the fact that the performance of an outside agency such as Laboratory Billing Services was not substantially better than Riley PA's own collection rate indicates that the problems affecting Riley PA's internal collection processes did not have as substantial of an effect on the end result as Gilmore argues. Further, the testimony of Gilmore's expert that one should expect a collection rate as high as 70% is also weakened by her acknowledgement that even a 50% rate, such as that of Riley PA prior to its decision to assign its collection work to an outside agency, is not unreasonable, although still on the low side.

Even prior to the time Riley PA began to outsource its collection work, Gilmore began to look for work elsewhere. In February 2005, he initiated contact with MedNow, a medical clinic in Orono, instructing its representative not to contact him (Gilmore) at his office at Riley PA and not to contact Riley himself about his interest in MedNow. *See* plaintiff's exhibit 25. By early April, Gilmore had visited MedNow's offices and agreed to work there several days that month. *See* plaintiff's exhibit 27. Again, Gilmore instructed MedNow's representative not to identify himself if he had to call Gilmore at this office. He continued to cover shifts there through the end of June, earning $6,120.

In the meantime, Riley PA did not pay Gilmore in May, and Gilmore scheduled a vacation beginning in late May 2005. In fact, he saw patients at Riley PA for the last time on May 24. Gilmore sent a memorandum to Riley, advising that he would not work during June and July and would correspondingly forego pay that would be due to him for June and July. *See* plaintiff's exhibit 39. In the middle of June, Gilmore's attorney notified Riley's attorney that Gilmore was terminating his employment with Riley PA, and Gilmore's attorney then send Riley PA a written demand for compensation payments the firm failed to make to Gilmore in November and December 2004 and May 2005. *See*

5

plaintiff's exhibit 46. Riley PA accepted Gilmore's resignation effective June 30, 2005. *See* plaintiff's exhibit 47.

In this action, Riley PA seeks to recover three elements of damages from Gilmore for breach of contract. First, it claims the amount by which shared expenses charged to him exceeded the amount of actual revenue that he generated. Riley PA argues that this sum is $153,088. *See* plaintiff's exhibit 54. Second, it seeks recovery of the income that Gilmore received from MedNow, $6,120. Finally, Riley PA seeks recovery of half of the amount that it owed to the lender-bank on the note it executed to obtain operating money when Gilmore began to work with the practice; this amount claimed is approximately $7,450. *See* plaintiff's exhibit 41A.

In defense of these claims for relief, Gilmore first argues that the written employment agreement assures him of a monthly salary of $10,000 and that none of this money is subject to recoupment, even if the receipts he generated were exceeded by his share of common expenses as defined in the compensation formula. For the reasons noted above, however, the history of the parties' negotiations and the written provisions of the contract undermine this argument. Riley PA agreed to pay Gilmore $10,000 per month. However, to the extent that Gilmore's share of expenses were not covered by amounts paid for his work, then Gilmore would be liable for that difference. And in the circumstance where Gilmore's liability to the firm exceeded $10,000, the monthly payment would be deemed an advance rather than as a salary. Gilmore's arguments to the contrary are not persuasive.

Gilmore next contends that he is excused from any liability to Riley PA because Riley PA engaged in a material breach of the employment contract when it failed to pay him in November and December 2004 and again in May 2005.

> When one party breaches a contract, the nonbreaching party may, depending on the circumstances, either treat the breach as partial or total. A total breach of contract is a non-performance of duty that is so material and important as to justify the injured party in regarding the whole transaction as at an end . . . If [the] breach is not sufficiently material and important for this, the breach is called a partial breach. If a party elects to treat the breach as partial, however, it must still perform its obligations in order for it to avoid also breaching the contract.

*Down East Energy Corp. v. RMR, Inc.*, 1997 ME 148, ¶ 10, 697 A.2d 417, 421.

For purposes of this analysis, the court assumes -- without deciding -- that under the factual circumstances of this case, Riley PA's failure to make the November and December 2004 payments to Gilmore as the employment contract required could have been treated as a material breach. Proceeding from this predicate, Gilmore would have been warranted in declining to perform his obligations under that contract. However, he continued to provide professional services to Riley PA, and in January 2005 Riley PA resumed its monthly payments to him. This means that Gilmore elected to treat Riley PA's non-performance in November and December as a partial breach, because Gilmore's own ongoing performance under the contract demonstrated that he did not view the contractual employment relationship "as at an end." *Down East Energy*, 1997 ME 148, ¶ 10, 697 A.2d at 421. Consequently, he himself was required to continue to perform under the contract, just as he did.

When Riley PA failed to pay Gilmore again, this time in May 2005, Gilmore's response was different. In its essence, he declined to continue working full-time, or perhaps at all, for Riley PA.[2] The court views this as an election by Gilmore to treat Riley PA's failure to pay him then as a total material breach. Gilmore was justified in his response. The employment contract obligated Riley PA to pay Gilmore $10,000 per month as actual compensation, or as an advance against future compensation, or as a combination of the two. The contract did not create any deadline that would terminate Riley PA's obligation to pay the advance component of any such monthly payment. Thus, as of May 2005, Gilmore was still contractually entitled to receive his monthly payment of $10,000. When Riley PA declined to tender that payment to him, Gilmore was justified in concluding – particularly when that non-payment was seen against the backdrop of prior failures to pay money Gilmore had the right to receive – that the employment relationship was at an end. Thus, as of the date when Riley PA failed to perform, Gilmore himself was excused from performing his reciprocal obligations under the contract. Thus, Gilmore's liability must be fixed as of the date Riley PA failed to perform. Although the record does not appear to reveal when, during a pay period,

---

[2] There is conflicting evidence about whether or not he made a sincere offer to work for Riley PA on a limited schedule or whether, in reality, he completely separated himself from the practice. Either way, his decision was one to not perform his obligations under the employment agreement.

7

Gilmore accrued the right to receive that month's payment, the evidence establishes that Gilmore chose to work for Riley PA through May 24, 2005. Because this date is therefore when Gilmore justifiably treated the employment relationship to have ended, his liability to Riley PA shall be fixed as of that date.

As is noted above, Riley PA contends that Gilmore is liable for the amount by which his share of the practice's expenses exceeded income received by the practice on account of his work; for amounts he earned from MedNow; and for half of the unpaid balance the practice owed on the start-up loan.

Riley PA first argues that Gilmore is liable for $153,088, representing the excess of shared expenses charged to Gilmore above receipts he generated for the practice. *See* plaintiff's exhibit 54. In fact, that debt as of April and May was greater. *Id.* Because Riley PA does not contend that these higher amounts of debt should be the basis for liability, the court uses the lower figure noted above. Gilmore contests this calculation primarily on the basis of evidence that Riley PA's collection process was deficient and that, if the practice had better success in its collection efforts, Gilmore would be credited with greater income and the resulting deficiency would be reduced or eliminated.

The record establishes without dispute that the practice's collection system was flawed. Riley himself engaged in ongoing efforts to improve the process by changing personnel who were responsible for collecting accounts receivable, by consulting with the practice's accountant, by retaining another outside consultant, and finally by delegating the collection work to an outside firm. Gilmore was also either a participant in these efforts or had the opportunity to be involved. The question presented here, however, is whether and to what extent improvements in collection efforts would have realized an increase in receipts for Gilmore's billings. The court addresses this issue on the assumption that Gilmore has preserved this issue in his pleadings, notwithstanding Riley PA's argument that he has not done so.

For the reasons noted above, the court concludes that the evidence does not support the opinion testimony of Gilmore's expert on the issue, who said that the practice should be able to achieve a collection rate of 65%-70%. The better evidence is that the firm's own collection rate of roughly 50% is within an expected and reasonable

standard.[3] Even when Riley PA retained a collection agency, which presumably could invoke expertise and efficiency to the process, the collection rate increased only marginally, to 57% -- still far short of the goal advanced by Gilmore's expert. More significantly, the employment contract that articulated Gilmore's compensation formula did not establish any quantitative standard that Riley PA was required to meet in its collection efforts. Rather, the contract obligates the practice to bill patients and payors. Riley's compensation was the product of the same type of formula used to determine Gilmore's, and so he had the same interest of maximizing collections.

Here, in the end, the evidence demonstrates that there were aspects of the practice's collection system that were flawed. There were instances, for example, when claims were not submitted in a timely way, and some members of the practice's staff who were assigned to collections were not fully trained. However, even as Gilmore's expert describes the process, a substantial amount of accounts receivable are not collected in the end. Even under her analysis, at least one-third of billings are never paid or are written off. And the dedicated collections agency that Riley PA retained in 2005 secured payments on little more than half of the practice's billing. Because the amount that Riley PA actually received from its accounts receivable was not outside of the parameters of a reasonable rate, and because much of a practice's billing is uncollectible, the court cannot conclude on this record that even if Riley PA had an obligation to improve its collections practices, and even if it did so, it would have realized a material increase in receipts of billings attributable to Gilmore's work. In this analysis, the court also bears in mind the evidentiary principal that an aggrieved party is not required to prove damages to a mathematical certainty. Rather, a "probable estimate" and "judgmental approximation" are a sufficient basis for the computation of damages, so long as the amount of such

---

[3] As of the time when Riley PA assigned its accounts receivable for collection by Laboratory Billing Services, the total amount due to the practice was nearly $245,000. Gilmore's expert testified that within several months after the collection agency became involved, the practice's accounts receivable had doubled. She acknowledged that this was a "guesstimate," and it is not a figure supported by the evidence. She used the larger figure, however, in support of an opinion that Gilmore should be given credit of roughly $250,000 of additional receipts. The foundation for this analysis has not been proven, and the court does not accept the conclusion.

9

damages are established to a probability. *Merrill Trust Co. v. State*, 417 A.2d 435, 440-41 (Me. 1980), *quoted in Down East Energy Corp.*, 1997 ME 148, ¶ 7, 697 A.2d at 420.

Gilmore may also be seen to argue that Riley PA's bookkeeping practices were not reliable, and that as a result, the amount of income attributable to him was understated and the amount of shared expenses charged to him under the formula is not supported by the evidence. Riley PA's accountant testified that he developed an in-house set of computer queries based on a standard and commonly used bookkeeping software. From his observations, the practice's staff used the program correctly. In other external contexts, the system was problematic. For example, some of Gilmore's billings were submitted to third-party payors under Riley's name because Gilmore was not credentialed with some of them. However, particularly in the absence of any specific persuasive challenges to the income and expense figures, the court credits evidence that by use of patient schedules and other data, receipts were properly allocated between the two doctors and that any misallocation of those receipts was not material.

Based on this evidence, the court concludes that Gilmore is liable to Riley PA in the amount of $153,088.

Next, Riley PA seeks recovery of the amount of income that Gilmore received from MedNow. As is noted above, Gilmore treated Riley PA's failure to pay him in May 2005 as a total material breach when he last saw patients there, on May 24, 2005. As of that date, he had earned $2,100 from MedNow. *See* plaintiff's exhibit 38. This income is treated as the property of Riley PA. Income that Gilmore received from MedNow after that date is not subject to recovery by Riley PA.

Finally, Riley PA seeks recovery for half of the balance on the loan associated with Gilmore's new employment at the practice in August 2003. The parties have presented evidence of the loan balance as of the end of May 2005 and as of the end of June 2005. *See* plaintiff's exhibit 41A. The former date is closest to the time when Gilmore is deemed to have terminated the employment relationship. The balance at that time was $15,400. Half of this amount is $7,700, and Gilmore is contractually liable to Riley PA for this sum.

10

In his counterclaim, Gilmore alleges that Riley PA breached the employment contract by failing to pay him in the three months discussed above and that it is liable to him pursuant to 26 M.R.S. § 626. He has not proven either of these claims.

First, as is discussed above, Riley PA did breach the employment agreement because it did not pay him $10,000 in November 2004, December 2004 and May 2005. However, Gilmore has not suffered any damages as a result of those breaches. As of the dates when each of those payments was due from Riley PA, Gilmore was in considerable debt to the practice, because the expenses chargeable to him substantially exceeded the revenue he had brought into the office. Therefore, the payments of $10,000 that Riley PA should have paid Gilmore were merely advances against Gilmore's future net revenue. In fact, if Riley PA had made those payments to Gilmore, Gilmore's debt to the practice would only have increased further. "As a general rule, the purpose of an award of compensatory damages for a breach of contract is to place the plaintiff in the same position that he or she would have enjoyed had there been no breach." *Lee v. Scotia Prince Cruises Ltd.*, 2003 ME 78, ¶ 22, 828 A.2d 210, 216. Because the money that was due from Riley PA during the three months at issue was not Gilmore's to keep but rather was an advance, Gilmore has not demonstrated that he was harmed when Riley PA did not pay him those sums.

Gilmore's claim pursuant to section 626 also fails. When Gilmore terminated his employment with Riley PA, Riley PA did not owe Gilmore any wages. Rather, Gilmore owed the firm for the negative difference between expenses charged to Gilmore and receipts he generated. His written demand for payment of allegedly outstanding wages was premised on his contention that he was entitled to a guaranteed salary of $10,000 per month, and his demand frames the unpaid wages based on this calculation. Because, however, the contractual payments did not constitute a salary, his characterization of the unpaid amount as wages was incorrect.

The entry shall be:

For the foregoing reasons, judgment on the second amended complaint is entered for the plaintiff. On count 1, judgment is entered in the amount of $153,088. On count 2, judgment is entered in the amount of $2,100. On count 3, judgment is entered in the amount of $7,700. Count 4 is dismissed as moot. On each count, the plaintiff is awarded

11

pre-judgment interest at the annual rate of 5.77% and post-judgment interest at the annual rate of 10.99%. The plaintiff is awarded its costs of court.

On the counterclaim, judgment is entered for the counterclaim defendant (the plaintiff).

Dated: December 27, 2007

_____
Justice, Maine Superior Court

A TRUE COPY
ATTEST: _____ CLERK

12